AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  17MJ1891 JMA
) 17MJ1395 DHB
One Apple Cellular Telephone )
Model: iPhone 6 a1549 )
EMEI: 358371061347319 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A (incorporated herein)

located in the    Southern    District of    California    , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B (incorporated herein)

FILED
JUN 1 2 2017
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                        DEPUTY

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

   *Code Section*                                    *Offense Description*
Title 8 U.S.C § 1324(a)(l)(A)(ii)    Conspiracy to Transport Illegal Aliens
and (v)(l)

The application is based on these facts:
See attached affidavit of Border Patrol Agent Derek Hernandez

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Derek Hernandez, Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/23/17

*Judge's signature*

City and state: San Diego, California        Hon. Jan M. Adler, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH OF:<br><br>Apple Cellular Telephone<br>Model: iPhone 6 a1549<br>IMEI: 358371061347319 | **AFFIDAVIT OF DEREK HERNANDEZ IN SUPPORT OF SEARCH WARRANT** |

## AFFIDAVIT

I, Derek HERNANDEZ, Border Patrol Agent with the United States Department of Homeland Security, Customs and Border Protection, United States Border Patrol, having been duly sworn, depose and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant in furtherance of an alien smuggling investigation conducted by United States Border Patrol ("USBP") Agents for the following target property:

One Apple iPhone; Model: 6 a1549; IMEI: 358371061347319 (hereinafter **"Target Telephone"**).

2. The **Target Telephone** was seized from Jessica CARRILLO ("CARRILLO"), following her arrest for Conspiracy to Transport Illegal Aliens, in violation of Title 8 U.S.C. § 1324 (a)(1)(A)(ii) and (v)(I).

3. Probable cause exists that **Target Telephone** contains evidence relating violations of Title 8 U.S.C §1324(a)(l )(A)(ii) and Title 8 U.S.C. § 1324 (a)(l )(A)(ii) and (v)(I), Transportation of Illegal Aliens and Conspiracy to Transport Illegal Aliens. Probable cause exists to believe that the **Target Telephone** contains evidence of a crime and property designed for use, intended for use, or used in committing a crime. Specifically, I have probable cause to believe CARRILLO used the **Target Telephone** to communicate with co-conspirators during the alien smuggling event. Probable cause exists to believe that the **Target Telephone** contains evidence relating to violations of Title 8 U.S.C §1324(a)(l )(A)(ii) and Title 8 U.S.C. § 1324 (a)(l )(A)(ii) and (v)(I), Transportation of Illegal Aliens and Conspiracy to Transport Illegal Aliens.

4. The **Target Telephone** is currently in the possession of the Campo Border Patrol Station at 32355 Old Highway 80 Pine Valley, California 91962.

5. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I believe the items to be seized set forth in Attachment B (incorporated herein), may be or lead to: (1) evidence of the existence of alien smuggling or conspiracy to transport illegal aliens in violation of Title 8 U.S.C §1324(a)(l )(A)(ii) and Title 8 U.S.C. § 1324 (a)(l )(A)(ii) and (v)(I), Transportation of Illegal Aliens and Conspiracy to Transport Illegal Aliens; (2) contraband, fruits of crime, or things otherwise criminally possessed; and (3) property designed or intended for use, or which is or has been used as a means of committing criminal offenses.

**EXPERIENCE AND TRAINING**

6. I am an Agent within the United States Department of Homeland Security (DHS), Customs and Border Protection ("CBP"), United States Border Patrol ("USBP"). I have been employed as a USBP Agent since June, 2004. I am presently assigned to the Campo Station Abatement Team (CSAT) at the Campo Border Patrol Station. I am a graduate of the United States Border Patrol Academy at the Federal Law Enforcement Training Center (FLETC) in Charleston, South Carolina. I have received basic training in

investigating alien smuggling, identifying immigration violations, and enforcing numerous immigration and customs laws within the United States.

7. I am currently tasked with conducting investigations of criminal violations relating to alien smuggling. I have participated in numerous alien smuggling-related investigations, many of which involved the arrest of persons for alien smuggling offenses. In those cases, I conducted interviews with the arrested persons and their associates. Through these interviews, I have gained a working knowledge and insight into the activities and operations of alien smugglers.

8. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. I am also aware that it is a common practice for alien smugglers to communicate with the smuggled aliens regarding smuggling arrangements and payment utilizing cellular telephones. Alien smuggling events generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, and phone numbers of co-conspirators and aliens to be smuggled.

9. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of alien smuggling investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

10. Based upon my training and experience as a USBP Agent, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Alien smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, GPS applications, and voice messages.

b. Alien smugglers will use cellular telephones because they are able to actively monitor the progress of the illegal aliens while they are in transit.

c. Alien smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time the smuggled aliens will arrive at predetermined locations.

d. Alien smugglers will use cellular telephones to direct drivers to synchronize a drop off and/or pick up time of the smuggled aliens.

e. Alien smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity including the presence and location of marked and unmarked units, as well as the operational status of USBP checkpoints.

f. Alien smugglers will use cellular telephones to make arrangements with the smuggled aliens prior to the smuggling event, and to arrange for payment after the smuggling event.

g. Alien smugglers will use GPS devices in remote areas to guide them to the location of the aliens to be smuggled, as well as to the final destination of the smuggled aliens.

h. Alien smugglers will use cellular telephones to take photos of law enforcement operations and illegal activities.

## PROBABLE CAUSE

11. On May 7, 2017, Border Patrol Agent Anthony Magana and his Canine Partner, were assigned to highway interdiction duties on Interstate 8 in the Campo Border Patrol Station's area of responsibility. Agent Magana and Canine are trained and certified in the detection of the odors of marijuana, methamphetamine, heroin, cocaine, and their derivatives, as well as concealed humans.

12. Agent Magana was conducting highway interdiction and anti-smuggling duties on traffic traversing westbound Interstate 8. The USBP Interstate 8 westbound checkpoint was non-operational due to inclement weather. The checkpoint is located in

4

Pine Valley, California, which is in the remote mountainous region in the East County area of San Diego, California. Many areas surrounding this location are well-known alien smuggling and narcotics load-up spots due to the proximity to the U.S./Mexico international boundary. During periods of inclement weather, illicit trafficking increases on Interstate 8 due to the checkpoint closure. Interstate 8 is used as a major artery of smuggling activity for traffickers to further their groups of illegal immigrants and narcotics into the interior of the United States.

13. At approximately 3:50 p.m., Agent Magana was travelling eastbound on Old Highway 80 near the intersection of Jewel Valley Road and Ribbonwood Road when he observed a silver Ford Focus bearing California license plate 7MSP240 pass his location at a high rate of speed. The vehicle was driving so fast that the tires squealed turning northbound on Ribbonwood from Old Highway 80. Agent Magana observed that the individual driving the vehicle was a Hispanic male wearing a gray hoodie sweatshirt and black rimmed glasses. The driver was later identified as Cesar Raul GASTELUM. As the vehicle passed Agent Magana's position, he was unable to see in through the rear windows. Additionally, the front windshield was cloudy with condensation, which is indicative of people having entered the car recently. The heat and moisture from within car condenses on the windshield, fogging up the glass as the temperature disparity between the outside and inside the car equalize. The condensation accumulates on the inside because the outside temperature is colder; when it is colder outside the relative humidity point inside the vehicle becomes lower. This occurs especially in rainy weather when people who are wet enter a warm vehicle.

14. At approximately 3:55 p.m., Agent Magana requested records checks through San Diego Sector Dispatch on the 2012 Ford Focus. The registered owner came back as Macias International Inc., DBA: International Car Rental, 710 E. San Ysidro Blvd in the city of San Ysidro, California. Vehicles most commonly used in smuggling events are often registered to individuals or businesses located away from the area in which the smuggling occurs, or with incomplete registrations, such as pending master file records,

5

releases of liability or even more blatantly, completely devoid of license plates so as to conceal the identities of the smugglers as they conduct their illicit activities. Given the heavy condensation on the vehicle's windows, the high speed at which the driver fled from a well-known alien smuggling area, the checkpoint closure due to inclement weather, and the vehicle's registration from an area well outside of the Boulevard, California area, BPA Magana believed that the driver of the silver Ford Focus was transporting illegal aliens.

15. At approximately 4:10 p.m., Agent Magana activated his emergency lights and sirens as he initiated a vehicle stop on Interstate 8 westbound at approximately one mile west of Buckman Springs Road. GASTELUM stopped the vehicle and as Agent Magana approached the vehicle, GASTELUM looked away and avoided eye contact with Agent Magana. Agent Magana noticed that there was one passenger in the front passenger's seat, which Agent Magana did not see as the Ford Focus passed his location on Ribbonwood Road. Agent Magana identified himself as a United States Border Patrol agent and asked GASTELUM to state his citizenship. As GASTELUM stated that he was a United States citizen, Agent Magana looked into the backseat and could see two Hispanic females sitting in the backseat. All passengers appeared to have on wet clothing as if they just jumped into the vehicle recently. Additionally, the passengers were wearing "booties" on their feet. Booties are pieces of blanket which are tied around the shoes of people who try to illegally enter the United States to avoid detection by Border Patrol.

16. At 4:12 p.m., Agent Magana advised GASTELUM that he was being detained while he conducted his investigation and also advised him that he was being placed in handcuffs for his own safety. As Agent Magana walked GASTELUM away from the Ford Focus, GASTELUM was concerned about how much jail time he would receive for transporting illegal aliens. At approximately 4:15 p.m., Agent Magana conducted an immigration inspection on all three passengers. Agent Magana asked the first male, later identified as Ezequiel RAMIREZ-Morelos, to state his citizenship in the Spanish language. RAMIREZ stated that he was a citizen of Mexico and was born in Oaxaca, Mexico. Agent Magana asked him if he had any documents which allowed him to be

6

present in the United States. RAMIREZ stated that he did not. Agent Magana then asked the second female subject, later identified as Claudia RAMIREZ-Morelos, to state her citizenship in the Spanish language. Claudia RAMIREZ-Morelos stated that she was a citizen of Mexico, also born in Oaxaca, Mexico. Agent Magana asked her if she had any documents which allowed her to be present in the United States. Claudia RAMIREZ-Morelos stated that she did not. Agent Magana then asked the third female subject, later identified as Marcelina RAMIREZ-Morelos, to state her citizenship in the Spanish language. Marcelina RAMIREZ-Morelos stated that she was a citizen of Mexico, also born in Oaxaca, Mexico. Agent Magana asked her if she had any documents which allowed her to be present in the United States. Marcelina RAMIREZ-Morelos stated that she did not. All three subjects stated that they had just recently crossed the international border illegally about an hour ago and got picked up by the silver Ford Focus.

17. At approximately 4:15 p.m., Agent Magana placed GASTELUM under arrest for Title 8 USC 1324(a)(1)(A)(ii), Transportation of Illegal Aliens.

18. At approximately 4:25 p.m., CSAT agents arrived at Agent Magana's vehicle stop. CSAT Agent Blanchard read GASTELUM his Miranda Warnings. GASTELUM told Agent Blanchard that he understood his rights and wished to speak with agents, without an attorney present.

19. Agent Blanchard asked GASTELUM if he was willing to assist the Border Patrol in the alien smuggling investigation he was involved with, realizing that neither Agent Blanchard, nor the Border Patrol were making any promises of leniency or offered any favorable disposition in his criminal case. GASTELUM told CSAT agents that he understood that by assisting agents with our investigation, he would not receive any special favors, leniency, or immunity in his criminal case. GASTELUM told Agent Blanchard that he was hired to smuggle three illegal aliens for a woman he met in Tijuana, Mexico. GASTELUM acknowledged that he committed a crime by transporting the three illegal aliens in his car, and admitted that he was to transport them to this woman (later identified as CARRILLO).

20. When CSAT agents asked how he was communicating with the woman later identified as CARRILLO, GASTELUM informed Agent Blanchard that he was speaking with her by cellular telephone, and that her number was 1 (619) 808-2635. Agent Blanchard asked GASTELUM if CSAT agents could search, answer, make phone calls, check text messages and send text messages using his small black cellular telephone (phone number 1 (213) 604-7098). GASTELUM freely consented and informed CSAT agents that CARRILLO provided him with the cellular telephone he was using to communicate with the coordinators. GASTELUM told CSAT agents that he was willing to speak with CARRILLO on the phone and agreed to identify CARRILLO and the vehicle she was driving earlier that day (a black BMW).

21. While speaking with GASTELUM, the small black cellular telephone continued to ring; this time the number was 1(619) 551-9069. Agent Blanchard asked GASTELUM who was calling. GASTELUM told Agent Blanchard that it was a silver Volkswagen Jetta who had been following him. GASTELUM elaborated and told CSAT agents that the driver of the Jetta was in fact working with the coordinators and acting as a scout for GASTELUM's load of illegal aliens. Agent Blanchard asked GASTELUM to whom the silver Ford Focus he was arrested in belonged. GASTELUM told Agent Blanchard that the Ford Focus was registered to him and he had owned the car for approximately two weeks. GASTELUM freely agreed to communicate with CARRILLO and allowed CSAT agents to utilize the Ford Focus in their investigation. Agent Hernandez, Agent Blanchard and GASTELUM drove the silver Ford Focus toward San Diego to meet CARRILLO, the organizer of the smuggling event. The small black cellular telephone rang again, with CARRILLO calling. Agent Blanchard allowed GASTELUM to answer his phone on speaker; Agent Blanchard and Agent Hernandez heard a woman ask where he was and ask what had happened. GASTELUM told CARRILLO that he had been pulled over by the Border Patrol on Interstate 8, however they let him go and did not arrest him. GASTELUM asked CARRILLO where he needed to meet her and deliver the three illegal aliens. CARRILLO told GASTELUM to meet her at a taco shop next to a gas station of

8

the Mollison exit in El Cajon, California. CARRILLO provided further instruction to call her once he had reached the Mollison exit. Once CARRILLO knew GASTELUM had the illegal aliens and met her face to face, CARRILLO told GASTELUM that she would lead him and the illegal aliens to a hotel in National City, California and await further instructions.

22. GASTELUM described CARRILLO as a fair skinned female with light hair. At approximately 5:15 p.m., CSAT agents exited Interstate 8 at the Mollison exit in El Cajon, California. Agent Blanchard saw a gas station on the west side of Mollison and a Denny's restaurant on the east side of Mollison- Agent Blanchard could not see a taco shop anywhere near the gas station. Agent Blanchard drove the silver Ford Focus into the Denny's parking lot, however as CSAT agents approached the Naranca Avenue and Mollison Avenue intersection, agents observed a black BMW parked with its engine running on the north side of Naranca Avenue, facing westbound at the intersection of Mollison.

23. Immediately, GASTELUM positively identified the black BMW belonging to CARRILLO. Agent Blanchard asked if GASTELUM was sure, he said he was "positive" it was her car, and she was sitting in the driver's seat. GASTELUM was so sure it was her, he attempted to lean forward in an effort to cover his face so as not to be identified as working with law enforcement. GASTELUM called again and told CARRILLO that he had arrived at the prearranged location. As soon as GASTELUM told CARRILLO, she put the BMW in drive. Agent Blanchard could see a female driver on the phone, looking around frantically when GASTELUM spoke to her on the cell phone. CARRILLO told GASTELUM to follow her to National City, where they would go to the aforementioned hotel and release the illegal aliens to another driver to be taken to Los Angeles, California.

24. At approximately 5:17 p.m., Agent Blanchard parked the Ford Focus in front of the BMW in order to impede and safely prevent the BMW from fleeing. Agent Marmolejo activated his emergency lights and pulled in behind the parked BMW. Agent Marmolejo and Agent Blanchard approached the driver of the BMW and identified

themselves as law enforcement. CSAT agents removed CARRILLO from the BMW and shortly thereafter at approximately 5:17 p.m., Agent Blanchard placed CARRILLO under arrest for alien smuggling. CSAT agents searched the BMW and located the **Target Telephone** within the BMW. GASTELUM called the same number he had been using to communicate the coordinating instructions of the smuggling event with, 1(619) 808-2635. The **Target Telephone** in CARRILLO's car rang, displaying GASTELUM's cellular telephone number 1(213) 604-7098.

25. At approximately 5:24 p.m., Agent Blanchard confirmed Jessica CARRILLO's biographical information. At approximately 5:25 p.m., Agent Blanchard read CARRILLO's miranda warnings to her and agreed to speak with agents without an attorney present. CARRILLO immediately blurted out that she was only to "give the green light." Agent Blanchard asked her what that meant, and she replied with "once the driver came and wasn't followed, I have to call them back and tell them." CARRILLO admitted that she spoke with GASTELUM and gave him directions on where to take the car full of illegal aliens. CARRILLO told agents that she knew what she was doing was illegal.

26. During the interview, an individual with a Mexican phone number contacted CARRILLO on the **Target Telephone**. According to CARRILLO, the caller, was the individual who hired her to participate in the smuggling venture. Per CARRILLO, the caller was an individual named Martin who went by the moniker "El Negro." While on the phone with CARRILLO, El Negro gave CARRILLO the address to a hotel in National City. However, he later called back with scrutinizing questions. Given El Negro's line and tone of questioning, Agents terminated the operation and ordered CARRILLO and GASTELUM to be transported back to the Campo Border Patrol Station for further processing.

27. On May 7, 2017, at approximately 10:37 p.m., Supervisory Border Patrol Agent Benjamin Blanchard conducted a videotaped interview with Jessica CARRILLO. CARRILLO was reminded her Miranda Rights during the videotaped

interview at approximately 10:39 p.m., and again agreed to speak with agents without an attorney present.

28. CARRILLO stated that on May 7, 2017, she was helping GASTELUM, smuggle undocumented aliens into the United Sates. CARRILLO stated that her purpose in the smuggling event was to make sure that GASTELUM was not being followed by law enforcement when he arrived at her location. CARRILLO stated that she was going to get paid $800.00 U.S. dollars for today's smuggling event. CARRILLO told agents that she was recruited by a man that she met in Mexico that goes by the name, Martin and nickname, "El Negro." CARRILLO stated that she had only met "El Negro," one time before in Mexico. CARRILLO gave "El Negro" her personal cell phone number and El Negro contacted her several times on **Target Telephone**. CARRILLO stated that she used her own personal "rose pink" iPhone, **Target Telephone**, to stay in contact with the smuggling vehicle driven by GASTELUM.

29. On May 7, 2017, at approximately 10:04 p.m., Supervisory Border Patrol Agent Benjamin Blanchard conducted a videotaped interview with Cesar GASTELUM. GASTELUM acknowledged being read his Miranda rights at the time of arrest, which took place earlier that day, at approximately 4:25 p.m. GASTELUM acknowledged that he understood his rights and agreed to speak with the agents without an attorney present.

30. GASTELUM stated that he had previously met CARRILLO in a night club in Tijuana, Mexico. GASTELUM stated CARRILLO recruited him to pick up undocumented people. Regarding the current incident, GASTELUM stated that he had met with CARRILLO earlier on May 7, 2017, to pick up a phone. GASTELUM described the phone as a small black cellular telephone with the phone number (213) 604-7098. GASTELUM later used the small black cellular telephone to contact CARRILLO on the **Target Telephone**. GASTELUM acknowledged CARRILLO's phone number as (619) 808-2635. GASTELUM was instructed by CARRILLO, via the small black cellular telephone she provided him, to drive out to a Chevron and Shell Gas Station in Boulevard,

11

California. GASTELUM stated that he was supposed to drive to this location and pick up three undocumented people.

## SEARCH PROTOCOL

31. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

32. Following the issuance of this warrant, I will collect the **Target Telephone** out of evidence and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

33. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take days, weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

34. Following the issuance of this warrant, I will collect the **Target Telephone** and, with assistance if necessary from cellular telephone forensic examiners, will attempt to securely power the device, identify whether they are protected by a personal identification number (PIN), determine or circumvent the PIN and image or retrieve data subject to seizure pursuant to this warrant from the device. The search of the device or of an image on the data on the device will be limited to identifying and seizing data subject to seizure pursuant to this warrant and, in any event, will be limited to only the information to be found on basic cellular telephones: digital, cellular, and/or telephone numbers and/or direct connect numbers assigned to the device; call and direct connect history information; list of contacts stored on the device; text messages stored on the device; and, if equipped as a camera, photographs and videos stored on the device. In the event that I or other personnel lawfully conducting the analysis identify information pertaining to crimes outside the scope of the warrant, such information will not be used in any way unless a new warrant is obtained to search for such information.

35. I, or any other duly authorized federal agent, will personally serve the warrant requested above, and will be assisted by other duly authorized federal investigators.

## CONCLUSION

36. Here, probable cause exists based on multiple facts. First, USBP agents identified three illegal aliens in the vehicle driven by GASTELUM and guided by CARRILLO. Second, GASTELUM and CARRILLO both admitted they were being paid to assist in the transportation of the illegal aliens. Third, GASTELUM admitted that he received instructions during the smuggling venture from CARRILLO via the **Target Telephone**. Lastly, CARRILLO admitted to using the **Target Telephone** to communicate

13

with GASTELUM on the day of event and also to communicate with her recruiter in Mexico, who hired her to participate in the smuggling venture.

37. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude that CARRILLO used the **Target Telephone** to facilitate alien smuggling, during the period of January 1, 2017 to May 7, 2017. Specifically, (1) GASTELUM's statements that he was recruited by CARRILLO at an earlier date and time to smuggle aliens, and purchased the load vehicle two weeks prior to the incident; and (2) CARRILLO's statement that she was recruited at an earlier date and time, and received several prior phone calls on the phone from her recruiter El Negro. Additionally, based on my training and experience, given CARRILLO's more senior role of facilitator and recruiter, probable cause exists to believe that her involvement in the alien smuggling venture extends back to January 1, 2017, or a date and time before.

38. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude that CARRILLO used the **Target Telephone** to facilitate alien smuggling, during the period of January 1, 2017 to May 7, 2017, and **Target Telephone** was used to facilitate the offenses by transmitting and storing data, which constitutes evidence, fruits, and instrumentalities of violations of Title 8 USC §1324(a)(1)(A)(ii) and Title 8 U.S.C. § 1324 (a)(1)(A)(ii) and (v)(I), Transportation of Illegal Aliens and Conspiracy to Transport Illegal Aliens.

39. Based upon my experience and training, consultation with other agents in alien smuggling investigations, consultation with other sources of information, and the facts set forth herein, the items described in Attachment B (incorporated herein) are likely to be found in the property to be searched described in Attachment A (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, a USBP Agent, or another federal law enforcement agent specially trained in digital evidence

//
//
//

14

recovery, to search the item described in Attachment A.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Derek Hernandez
Border Patrol Agent
U.S. Border Patrol

SUBSCRIBED AND SWORN TO ME BEFORE THIS 23rd DAY OF MAY, 2017.

_____
HONORABLE JAN M. ADLER
United States Magistrate Judge

15

*Search Warrant*
*Attachment A*
*Carrillo*

## ATTACHMENT A

### PROPERTY/ITEMS TO BE SEARCHED

The items/property to be searched are described as:

(1)   Apple Cellular Telephone

   Model: iPhone 6 a1549

   EMEI: 358371061347319

which is currently in the possession of the Customs and Border Protection Campo Border Patrol Station, 32355 Old Highway 80, Pine Valley, CA 91962.

*Search Warrant*
*Attachment B*
*Carrillo*

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the **Target Telephone** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Subject. The seizure and search of the **Target Telephone** will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Telephone** will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data, for the period of **January 1, 2017** to **May 7, 2017**:

1. Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

    a. tending to indicate efforts to smuggle illegal aliens into the United States from Mexico;

    b. tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to transport illegal aliens in the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in efforts to transport illegal aliens in the United States;

    d. tending to identify travel to or presence at locations involved in efforts to transport illegal aliens through the United States;

    e. tending to identify the user of, or persons with control over or access to, **Target Telephone**; or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above:

**which are evidence of violations of Title 8 U.S.C § 1324(a)(l)(A)(ii), and Title 8 U.S.C § 1324(a)(l)(A)(ii) and (v)(I), Transportation of Illegal Aliens and Conspiracy to Transport Illegal Aliens.**

The seizure and search of the cellular phone(s) shall follow the procedures outlined in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the cellular phone(s) may be searched for the evidence above.